1

2

3                          **UNITED STATES DISTRICT COURT**

4                                **DISTRICT OF NEVADA**

5                                        * * *

6    United States of America,                    Case No. 2:20-cr-00091-JCM-DJA

7                     Plaintiff,

8           v.                                    **REPORT AND RECOMMENDATION**

9    John Matthew Chapman,

10                    Defendant.

11   _____

12          Before the Court is Defendant John Chapman's Motion to Suppress Statements (ECF No.

13   70).  The Government filed a Response opposing the motion (ECF No. 79) and Chapman filed a

14   Reply (ECF No. 94).  The Court held an evidentiary hearing on November 30, 2023, and after

15   hearing from six witnesses, took the matter under advisement and indicated it would issue a

16   Report and Recommendation (ECF No. 117).  Because the Court finds that the *Miranda* warnings

17   were properly administered, Chapman's waiver of his *Miranda* rights was effective, and

18   Chapman's pre- and post-*Miranda* statements were voluntary, the Court recommends denying

19   Chapman's motion to suppress his statements.

20                       **PROCEDURAL AND FACTUAL BACKGROUND**[1]

21          Chapman was initially charged by way of complaint with one count of kidnapping resulting

22   in death in violation of 18 U.S.C. Section 1201(a)(1).  The case proceeded to a preliminary

23   hearing and ultimately, a federal grand jury returned a one count indictment charging Chapman

24   with the same crime.  Chapman subsequently filed a motion to suppress statements that he made

25

26

27   _____

28   [1] The Court only addresses the facts relevant to the dertermination of this motion.

1    on the night of his arrest to officers and detectives from the Bethel Park, Pennsylvania Police
2    Department.

3        In his motion to suppress his statements, Chapman argues the *Miranda* warnings were
4    defectively administered because the warnings' significance was deliberately minimized and the
5    procedure was characterized as a mere formality.  He argues that this, combined with his severe
6    neurodevelopmental conditions,[2] rendered his *Miranda* waiver involuntary.  Chapman further
7    argues his statements were involuntary because he was uniquely susceptible to interrogative
8    pressure due to his neurodevelopmental conditions and because detectives led him to falsely
9    believe he could avoid the death penalty.  Finally, Chapman argues the pre-Miranda statements he
10   made to an officer while awaiting formal questioning are inadmissible because they were the
11   result of non-*Mirandized* custodial interrogation.

12       The Government responds that the *Miranda* warnings were effectively administered and
13   despite Chapman's neurodevelopmental condition, he knowingly and intelligently waived his
14   *Miranda* rights before confessing.  The Government argues there was nothing coercive about the
15   interrogation and that Chapman's waiver was voluntary.  Finally, the Government concludes that
16   it will not seek to admit Chapman's pre-*Miranda* statements in its case in chief, and because those
17   statements were voluntary, will only use them for impeachment purposes.[3]

18       Chapman replies that detectives were aware of his neurodevelopmental disorders before
19   questioning him yet exploited, instead of accommodated, these deficits in hope of procuring a
20   *Miranda* waiver.  Chapman reiterates that his disorders vitiated the effectiveness of his waiver,
21   and that the voluntariness of the waiver was also vitiated because Chapman was led to believe he

22
23

24   [2] Chapman disclosed to Bethel Park officers and detectives that he has Tourette Syndrome,
25   Aspergers, Attention-Deficit/Hyperactivity Disorder (ADHD) and was taking Trileptal, BuSpar,
     and Prozac for these conditions.  (ECF No. 70-1 at 54-55).

26   [3] The Government also argues that statements Chapman made to his mother and wife during his
27   telephone calls to them at the conclusion of the interview and captured on video are admissible at
     trial.  Chapman does not address this in his Reply.  Because Chapman did not otherwise seek to
28   suppress these statements in his motion, the Court will not address these issues here.

was not a suspect.  Finally, Chapman argues his pre-*Miranda* statements are inadmissible even for impeachment purposes because they were not voluntary.

The Court held an evidentiary hearing on the motion at which the Government called six witnesses, all employed as officers or detectives with the Bethel Park Police Department. William Johnson testified that he was a dispatcher for the police department and was on duty the night of Chapman's arrest and confession.  He testified that upon arriving at work that day he was informed of a welfare check being done on a missing person who was a resident of Bethel Park. He testified he had four telephone calls with Chapman that evening and he was aware Chapman was in a relationship with the missing person.  He testified he was trying to stay in communication with Chapman because he felt Chapman knew the location of the missing person because he referred to her in the first conversation.  Chapman called Johnson the first two times, and Johnson called Chapman the second two times when Chapman failed to contact him as he promised.   Johnson testified that the calls were part of an effort to locate Chapman and the missing person, and he was unsuccessful in acquiring Chapman's location.  However, he testified that other officers were able to locate Chapman and that during the fourth and last phone call Chapman was pulled over and arrested.  All four telephone calls were recorded, and the recordings were entered into evidence by stipulation.

Officer Matthew Kearns was a patrol officer on the night in question and went to a location where he thought Chapman might be and waited.  He saw Chapman's vehicle pass by and he performed the initial stop on Chapman.  The stop was captured on the video dash camera of his patrol car.  He testified that additional officers appeared almost immediately after the stop, that he had no interaction with Chapman and that he stood by the door of his patrol vehicle behind Chapman's vehicle while other officers effectuated Chapman's arrest.  The video of the stop was admitted through Kearns by stipulation.

Officers Stephen Hozella and Jon Symsek were patrol officers working on the night of Chapman's arrest.  Hozella testified he was the officer who arrested Chapman.  He testified that Chapman did not appear intoxicated, appeared to understand and follow directions, that he never drew his weapon while arresting Chapman, and that no threats or promises were made to

1    Chapman during the arrest.  He testified that he had no conversation with Chapman and did not

2    ask him any questions.  Symsek testified that he was at the arrest scene and was the officer who

3    transported Chapman to the Bethel Park police station.  He testified that he searched Chapman for

4    weapons and during transport had no conversation with Chapman other than to explain what he

5    was doing.  He further testified that during this time that he never pulled his weapon and that no

6    threats or promises were made by him to Chapman.  Both Hozella and Symsek confirmed the

7    dash camera video entered in evidence was from the night of Chapman's arrest and accurately

8    depicted what occurred during the stop and arrest.

9         Upon arriving at the station, Symsek placed Chapman in an interview room after allowing

10   him to use the restroom.  Symsek provided Chapman with some water and was told to sit with

11   Chapman until Detectives arrived and could interview Chapman.  Symsek testified this lasted

12   much longer than he anticipated, approximately an hour or so.  Symsek testified he knew very

13   little about the investigation and was never told to interrogate Chapman.  In fact, he was told not

14   to *Mirandize* Chapman and testified that he had no intent to question Chapman.  He testified that

15   Chapman asked whether he was going to be read his *Miranda* warnings and Symsek testified that

16   his gut feeling was that Chapman wanted to talk.  He testified his goal was to keep Chapman

17   comfortable and engaging in conversation until detectives arrived.  He described Chapman as

18   engaged, responsive, and able to follow the conversation.  He testified that Chapman spoke more

19   than Symsek did and that he did not appear to be under the influence.  He testified that no

20   promises or threats were made to Chapman, and he never brandished his weapon during the hour

21   plus he spent with Chapman.  He testified his entire interaction with Chapman was captured from

22   the camera in the interview room and the video of his interaction with Chapman was entered into

23   evidence by stipulation.

24        Sergeant Michael Dunn testified that he was on duty that evening and was at the scene of

25   Chapman's arrest.  He too confirmed the dashboard camera accurately depicted the arrest and he

26   described his involvement.  He followed Symsek's patrol vehicle while Chapman was transported

27   to the station.  He testified he never pulled his weapon and had no conversation with Chapman.

28   He helped escort Chapman to the interview room after allowing him to use the bathroom.  He

described the interview room as approximately eight feet by ten feet with a table, two chairs, lockers for personal property, forms, and a working video camera. He testified that Chapman was cooperative, seemed to understand everything and that no threats or promises were made to Chapman. He also testified about additional investigation he conducted, including interviewing Chapman's mother and investigating bank records and other information. He also confirmed the accuracy of the video of the interview. After spending a brief period with Symsek and Chapman in the interview room, Dunn left and had no further contact with Chapman.

Finally, Detective Giles Wright testified that he primarily conducted the interview with Chapman. Wright testified that while he was present at the scene of Chapman's arrest, he does not remember what they might have briefly spoke about at the scene, but that Chapman was not *Mirandized* at the scene and he had no conversation at the scene with Chapman about the case. He testified he next saw Chapman at about 3:30 in the morning in the interview room. Wright testified he did not speak with Symsek regarding his conversation with Chapman prior to Symsek leaving, nor did he review video or audio of the discussion. Wright testified after brief introductions that he read Chapman his *Miranda* rights from a standard form. Wright testified that Chapman informed him of his mental health disabilities and that he took medication for them and Chapman confirmed he had taken his medication that day. Wright testified that no specific threats or promises were made to Chapman during the interview and that his weapon was never drawn. Wright acknowledged that his tone and demeanor changed when he confronted Chapman with inconsistencies in his story and with the evidence, and that his tone became louder in confronting Chapman. Chapman asked Wright about the death penalty and Wright replied they would try to help "any way they can" if Chapman were truthful. Other than these statements, Wright testified no other promises were made. Wright confirmed that the video of the

interrogation admitted into evidence was a fair depiction of the entirety of the interview and the video was entered into evidence.

While portions of the videos were played during the evidentiary hearing, the Court has since carefully reviewed and considered all of the videos in evidence in their entirety prior to rendering this Report and Recommendation.

## LEGAL STANDARDS AND ANALYSIS

**I.**   **The Court recommends denying Chapman's motion to suppress regarding his post-*Miranda* statements.**

Chapman argues that the detectives' *Miranda* warnings were defectively administered, that he did not knowingly or voluntarily waive them, and that his confession thereafter was coerced. The Court does not find these arguments persuasive.  It thus recommends denying Chapman's motion to suppress statements.

### *A.*   *Chapman understood his* **Miranda** *rights and voluntarily waived them.*

Before law enforcement officials may question a suspect in custody, the officials must inform the suspect that he has a right to remain silent, that his statements may be used against him in court, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to questioning. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  "For inculpatory statements made by a defendant during custodial interrogation to be admissible in evidence, the defendant's waiver of *Miranda* rights must be voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (quotation marks omitted).  The determination of whether a waiver was valid "depends upon the totality of the circumstances including the background, experience, and conduct of [the] defendant." *Id.* (quotation marks omitted).  "There is a presumption against waiver ... which the Government bears the burden of overcoming by a preponderance of the evidence." *United States v. Crews*, 502 F.3d 1130, 1139-40 (9th Cir. 2007).

In *Moran v. Burbine*, 475 U.S. 412, 421 (1986), the Supreme Court clarified the standard for determining whether the waiver of *Miranda* rights is effectuated:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* at 421 (citations omitted). The Court also noted that "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights." *Id.* at 423. In *Colorado v. Connelly*, 479 U.S. 157, 170 (1986), the Supreme Court declined to "find an attempted waiver invalid whenever the defendant feels compelled to waive his rights by reason of any compulsion." The Court noted that "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id.*

Chapman argues that he did not knowingly, voluntarily, or intelligently waive his *Miranda* rights. He claims that he did not understand his rights in the first place because Wright read them too fast and downplayed their significance. He claims that the speed and minimization of the *Miranda* warning, coupled with Chapman's neurodevelopmental conditions rendered his waiver involuntary. However, the totality of the circumstances weighs against Chapman's arguments.

The Court does not find Chapman's arguments that he did not understand the *Miranda* warnings in the first place to be persuasive after viewing the video of the questioning. While Wright could have read the *Miranda* warning slower and stated that the warning "is just protocol…just because [Chapman] was brought here in the back of a police car," Chapman otherwise demonstrated his understanding of what was going on. (ECF No. 70-1 at 63). Chapman was the first person to bring up his *Miranda* rights, asking about them first with Symsek and then Wright. Indeed, before Wright even began reading the rights, Chapman asked "[i]s that the *Miranda*?" indicating his understanding of what Wright was about to do. (*Id.*). Additionally, this was not Chapman's first encounter with the criminal justice system, having just

completed probation for federal charges.  Chapman's criminal history and anticipation of a

*Miranda* warning indicate that he understood his *Miranda* rights.  The Court thus does not find

that the *Miranda* warnings were defectively administered such that Chapman did not understand

them.

Regarding Chapman's aguments that his neurodevelopmental disorders impacted his

understanding of his *Miranda* rights and made it so that his waiver was not knowing, Chapman

himself noted that his disorders did not impact his ability to understand what was happening.

> THE DEFENDANT: All right.  Before we start, I do want to tell
> you.  I don't want you guys to think that means I'm, like, stupid or
> can't understand.  But I have learning disabilities myself.
>
> DETECTIVE WRIGHT:  Okay.
>
> THE DEFENDANT:  I have Tourette's.  I have attention-
> deficit/hyperactivity disorder.  And I have a type of autism called
> Asperger's.
>
> DETECTIVE WRIGHT:  Okay.
>
> THE DEFENDANT: Okay.  But I also—I don't want you to think
> that means I don't understand anything that's going on.  I do.
>
> DETECTIVE WRIGHT:  And if you need an explanation on
> anything if you don't understand, please ask.
>
> THE DEFENDANT:  And I will.

(*Id.* at 64-65).

Not only did Chapman inform Wright of his disorders, he let Wright know that he took

medication for them and also that he had taken his medication that day.  Ultimately, the Court

found no indication that Chapman's waiver of his *Miranda* rights was not knowing, voluntary, or

intelligent such that suppression is appropriate.  The Court thus recommends denying Chapman's

motion to suppress on *Miranda*-waiver grounds.

### B.    *Chapman's confession post*-**Miranda** *statements were voluntary.*

In evaluating the voluntariness of a confession, the test is whether "the government

obtained the statement by physical or psychological coercion or by improper inducement," *United*

1  *States v. Male Juvenile*, 280 F.3d 1008, 1022 (9th Cir. 2002) (citation omitted), such that the

2  "defendant's will was overborne" by the surrounding circumstances.  *United States v. Preston*,

3  751 F.3d 1008, 1016 (9th Cir. 2014) (en banc) (quoting *Dickerson v. United States*, 530 U.S. 428,

4  434 (2000)).  This is an "inquiry that 'takes into consideration the totality of all the surrounding

5  circumstances—*both* the characteristics of the accused *and* the details of the interrogation'"

6  *Preston*, 751 F.3d at 1016 (quoting *Dickerson*, 530 U.S. at 434) (emphasis in original).  The

7  government bears the burden of showing a confession is voluntary, *J.D.B. v. N. Carolina*, 564

8  U.S. 261, 269-70 (2011), and must do so by a preponderance of the evidence.  *Lego v. Twomey*,

9  404 U.S. 477, 489 (1972).

10       Coercive police activity is a necessary predicate to a finding that a confession is not

11  voluntary.  *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011); *see also Colorado v. Connelly*,

12  479 U.S. 157, 164-65 (1986) (providing examples of police overreaching)  "Coercive police

13  activity can be the result of either physical intimidation or psychological pressure."  *Brown*, 644

14  F.3d at 979 (internal citation omitted).  "The factors to be considered include the degree of police

15  coercion; the length, location and continuity of the interrogation; and the defendant's maturity,

16  education, physical condition, mental health, and age."  *Id.* (citing *Withrow v. Williams*, 507 U.S.

17  680, 693–94 (1993); *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004)).  "Cases finding

18  coercive police conduct have been manifestly outrageous."  *United States v. Burleson*, No. 2:16-

19  cr-00046-PAL-GMN, 2017 WL 8941310, at *5 (D. Nev. Jan. 11, 2017), *report and*

20  *recommendation adopted*, No. 2:16-CR-46-GMN-PAL, 2017 WL 484084 (D. Nev. Feb. 6, 2017)

21  (compiling cases).[4]

22  _____

23  [4] Citing *e.g.*, *Mincey v. Arizona*, 437 U.S. 385, 398–99 (1978) (finding statement obtained from a
   defendant who was in the hospital, in near coma condition, and in great pain, while fastened to

24  tubes, needles, and a breathing apparatus, could not have been voluntary); *Haynes v. State of
   Wash.*, 373 U.S. 503, 511–12 (1963) (invalidating confession where suspect was held for over

25  five days and never advised of his rights); *Ashcraft v. Tennessee*, 322 U.S. 143, 149–54 (1944)
   (invalidating confession because police questioned suspect for thirty-six hours straight); *Henry v.*

26  *Kernan*, 197 F.3d 1021, 1028 (9th Cir. 1999) (finding confession was involuntary because
   detectives admittedly continued the interrogation after the suspect clearly invoked his *Miranda*

27  rights); *California Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039, 1046 (9th Cir. 1999)

28  (finding coercive interrogation because the police disregarded the suspect's *Miranda* rights);

The Ninth Circuit has noted that a defendant's mental state alone does not make a statement involuntary. *Pollard v. Galaza*, 290 F.3d 1030, 1034 (9th Cir. 2002). "Rather, coercive conduct by police must have caused him to make the statements." *Id.* (internal quotations and citations omitted). In the absence of coercion, mental and emotional instability do not render inadmissible an intelligible and alert individual's voluntary statements. *See Preston*, 751 F.3d at 1019 (quoting *Connelly*, 479 U.S. at 164) (discussing *Connelly*'s affirmance that although the accused's state of mind is a factor in assessing the voluntariness of his responses, it is not in and of itself determinative).

Chapman argues that, not only was his waiver of *Miranda* involuntary, his confession thereafter was coerced because he was led to falsely believe that he could avoid the death penalty if he confessed and because detectives took advantage of his neurodevelopmental disorders.[5] However, the Court does not find that detectives acted coercively. Chapman was offered water and candy at the beginning of the interview and the questioning proceeded nonconfrontationally. While Wright expressed frustration at times during the process, these expressions of frustration did not rise to the level of intimidation that would render Chapman's confession involuntary. And there is no indication in the videotaped interrogation that Chapman displayed unique susceptibility to these expressions of frustration such that they became coercive. Additionally, Wright did not, as Chapman suggests, lead Chapman to falsely believe that he could avoid the death penalty if he confessed. Like the *Miranda* warnings and Chapman's neurodevelopmental

---

*United States v. Tingle*, 658 F.2d 1332, 1335–36 (9th Cir. 1981) (finding confession involuntary when officer recited a litany of maximum penalties for the suspect's alleged crimes, expressly stated that the suspect would not see her child "for a while, and warned the suspect that if she failed to cooperate he would inform the prosecutor that she was "stubborn or hard-headed").

[5] Chapman also argues that the waiver of *Miranda* was not knowing, voluntary, or intelligent because officers misinformed him regarding his status as a suspect and thus, Chapman did not realize the importance of *Miranda* to his particular circumstance. However, this argument is unpersuasive because Chapman was being investigated for the victim's disappearance as a result of being the last person to have contact with her and was then ultimately arrested in part for providing misleading and conflicting information to officers during that investigation. Given his involvement in the investigation and ultimate arrest, Chapman cannot persuasively argue that he believed he was not a suspect.

disorders, Chapman was the first person to bring the death penalty up.  And after he did—asking

if there was any way he would not get the death penalty if he came clean—Wright simply said

"we will help you out every way we can."  (ECF No. 70-1 at 110).  Ultimately, the Court does not

find that detectives coerced Chapman such that his confession was involuntary and thus

recommends denying Chapman's motion to suppress his post-*Miranda* statements on

involuntariness grounds.

**II.      The Court recommends denying Chapman's motion to suppress regarding his pre-*Miranda* statements.**

A violation of *Miranda* bars the Government from introducing a defendant's otherwise

voluntary statement in its case-in-chief but does not preclude the Government from using

defendant's statement for impeachment purposes if he testifies.  *Harris v. New York*, 401 U.S.

222, 225-26 (1971); *Oregon v. Elstad*, 470 U.S. 298, 318 (1985); *United States v. Patane*, 542

U.S. 630, 639 (2004).  However, an involuntary statement obtained from defendant in violation of

the Fifth Amendment may not be admitted for any purpose.  *Pollard v. Galaza*, 290 F.3d 1030,

1033 (9th Cir. 2002) (citing *Michigan v. Harvey*, 494 U.S. 344, 351 (1990) and *Henry v. Kernan*,

197 F.3d 1021, 1029 (9th Cir. 1999)).

Here, the Government asserts that it does not plan on using Chapman's pre-*Miranda*

statements in its case-in-chief.  But it asserts that it may use them for impeachment purposes if

Chapman testifies.  To that end, the Court must determine whether Chapman's pre-*Miranda*

statements were voluntary.

The Court does not find that Symsek obtained Chapman's pre-*Miranda* statements by

physical or psychological coercion or improper inducement, or that Chapman's will was

overborne by the surrounding circumstances.  Indeed, Chapman concedes that the pre-*Miranda*

questioning proceeded in a nonconfrontational manner.  And the totality of the circumstances do

not demonstrate that Symsek obtained Chapman's pre-*Miranda* statements by physical or

psychological coercion or improper inducement such that Chapman's will was overborne.

Chapman argues that Symsek acted in a coercive manner by pretending to make small talk, while

really intending to come away from the conversation with "something to go to the detective and

say." (ECF No. 70-1 at 35). Chapman adds that the wide-ranging nature of the conversation was intended to lay groundwork for the post-*Miranda* questioning. Ultimately, Chapman argues that, because Symsek "knew or should have known that his questioning of Mr. Chapman was reasonably likely to elicit incriminating responses," the Court should suppress the pre-*Miranda* statements. (ECF No. 70 at 9). But whether Symsek intended to elicit incriminating responses is not the test. Instead, it is whether he used physical or psychological coercion or improper inducement. And Symsek's actions here—making small talk and discussing a wide-range of topics—do not rise to the level of outrageousness that other courts have found to constitute coercion. Additionally, in the absence of police coercion, Chapman's mental state alone does not make his pre-*Miranda* statements involuntary. The Court thus recommends that Chapman's motion to suppress his pre-*Miranda* statements also be denied.

## CONCLUSION AND RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that Chapman's motion to suppress statements (ECF No. 70) be **DENIED**.

## NOTICE

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation. Local Rule IB 3-2(a). Failure to file a timely objection may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: March 6, 2024

_____
DANIEL J. ALBREGTS
UNITED STATES MAGISTRATE JUDGE