UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff(s),<br><br>v.<br><br>JOHN MATTHEW CHAPMAN,<br><br>Defendant(s). | Case No. 2:20-CR-91 JCM (DJA)<br><br>ORDER |

Presently before the court is Magistrate Judge Daniel Albregts' report and recommendation (ECF No. 168) to deny defendant John Matthew Chapman ("defendant")'s motion to suppress statements. (ECF No. 70). Defendant filed objections to the report (ECF No. 189), to which the government responded (ECF No. 192).

**I.   Background**

A.   General background

This criminal action concerns a kidnapping resulting in the death of a woman identified in all pleadings by the initials "J.F." ("J.F." or "the victim").[1] All facts described in this section are alleged in the government's criminal complaint.

In mid-September of 2019, defendant drove J.F. from her residence in Pennsylvania to Las Vegas, Nevada. (ECF No. 2 at 6). The signatory of the complaint, a special agent with the Federal

---

[1] Defendant's filing of objections to the magistrate judge's report lists the full name of the victim. (*See generally* ECF No. 189). For purposes of privacy, the court will use her initials in this order.

**James C. Mahan**
**U.S. District Judge**

1  Bureau of Investigation, alleges that defendant "misled" J.F. to believe the purpose of the trip was
2  a vacation to look at potential residences in Las Vegas. (*Id.*). However, the government claims
3  that this purpose was ruse, as defendant developed a plan before the couple left Pennsylvania to
4  kill the victim and even had a "kill kit" ready before their departure for Nevada. (*Id.*).
5
6  Defendant and J.F. arrived in the Las Vegas, Nevada area on September 23, 2019. (*Id.*).
7  Two days later, defendant convinced her to drive into the desert under the guise of participating in
8  a sadomasochistic and bondage-themed photo shoot. (*Id.*). Upon arriving in the desert in Lincoln
9  County, Nevada, defendant used plastic zip ties to affix the victim to a signpost. (*Id.*). After
10  applying duct tape to her mouth and then to her nose, defendant watched the victim die from
11  asphyxiation. (*Id.*).
12
13  Subsequently, defendant left J.F.'s naked body adjacent to the signpost and traveled back
14  to Pennsylvania, discarding her clothing at various locations along the return route. (*Id.*).
15  Defendant admitted that he killed J.F. for financial reasons. (*Id.*). The Lincoln County sheriff's
16  office reported that it had located a body on October 5, 2019, later identified as the deceased J.F.
17  (*Id.* at 6-7).
18
19  Defendant was initially charged by complaint in this district on February 20, 2020, with
20  one count of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). (*See generally
21  id.*). He made his initial appearance and had his detention hearing on May 1, 2020. (ECF No. 3).
22  A preliminary hearing commenced on May 15, 2020, before Magistrate Judge Brenda Weksler.
23  (ECF No. 13). On May 19, 2020, a grand jury returned a one-count indictment charging defendant
24  with the instant offense. (ECF No. 1).
25
26  . . .
27  . . .
28

**James C. Mahan**
**U.S. District Judge**

- 2 -

A. <u>Defendant's interaction with Officer Symsek and Detective Wright</u>

The subject of the instant motion is two interactions defendant had with law enforcement while in Pennsylvania. Shortly after local police commenced a missing persons investigation, they focused on defendant as a potential suspect. Defendant had four telephone conversations with the Bethal Park Police Department before a ping was acquired on his phone, allowing law enforcement to locate and arrest him during a high-risk traffic stop. (ECF No. 120 at 9-12).

Officer Jon Symsek ("Symsek") escorted defendant through the police station's exterior lobby. (*Id.* at 7). After defendant used the restroom, Symsek transported him into the interview room, where Symsek waited for other detectives to question defendant. (*Id.*). Symsek left to get a glass of water for defendant, and upon returning, defendant "brought up" whether Symsek would read him his *Miranda* warnings. (*Id.* at 112-13). Symsek testified that he had no intention of questioning defendant, but that he "had a gut feeling that he wanted to say something," prompting him to leave the room. (*Id.*).

Subsequently, Symsek spoke with his off-duty sergeant, voiced his concerns, and asked if he could read defendant his *Miranda* warnings. (*Id.* at 113). The sergeant told Symsek not to do so, as detectives would soon be in the room to start questioning defendant. (*Id.*). Symsek sat with defendant for roughly an hour, and he testified that his goal was "to keep him as comfortable as possible and try to just have some casual conversation." (*Id.* at 114).

He testified further that defendant was engaged in the conversation, spoke "way more" than did Symsek, and that he never made any promises or threats to defendant. (*Id.* at 115). Symsek also stated that defendant did not appear intoxicated during the hour they spent together in the interview room and that he never brandished his weapon. (*Id.*).

James C. Mahan
U.S. District Judge

- 3 -

Detective Giles Wright ("Wright") entered the interview room with defendant at 3:30 a.m. (*Id.* at 157). After introducing himself and his fellow detective to defendant, he read defendant his *Miranda* warnings. (*Id.* at 158). Defendant informed Wright that he was prescribed medication for his mental infirmities. (*Id.* at 160-61). Approximately twenty minutes into the conversation, Wright acknowledged that his "tone went up" after confronting defendant with inconsistencies in his story, but that he never threatened defendant or brandished his weapon. (*Id.* at 161).

Defendant asked Wright about the death penalty, and Wright's partner stated, "we will help you out every way we can." (*Id.* at 209). Defendant then made a confession to the detectives, wherein he disclosed the location of J.F.'s body. (*Id.* at 162).

B.  Motion to suppress statements

On August 9, 2022, defendant filed a motion to suppress statements, challenging his pre-*Miranda* and post-*Miranda* statements on several grounds, including the particular vulnerabilities resulting from his autism, Tourette's syndrome, and attention-deficit/hyperactivity disorder ("ADHD"). (ECF No. 70). The matter proceeded to an evidentiary hearing. (ECF No. 120).

Magistrate Judge Daniel Albregts issued a report and recommendation that this court should deny defendant's motion. (ECF No. 168). Defendant formulates two objections to the report: (1) that his *Miranda* waiver was invalid and (2) that his post-*Miranda* statements were involuntary and the report misconstrues the appropriate legal standard as well as the alleged *quid pro quo* resulting in his confession. (ECF No. 189). This court adopts the magistrate judge's report and recommendation in full.

**II.    Legal Standard**

This district's magistrate judges are authorized to resolve pretrial matters subject to the assigned district judge's review. 28 U.S.C. § 636(b)(1)(A); *see also* LR IB 3-1(a) ("[a] district

**James C. Mahan**
**U.S. District Judge**

- 4 -

judge may reconsider any pretrial matter referred to a magistrate judge in a civil or criminal case under LR IB 1-3 . . . ."). The reviewing district court judge "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1); *see also* LR IB 3-2(b).

The district court applies a "clearly erroneous" standard to the magistrate judge's factual findings, whereas the "contrary to law" standard applies to the legal conclusions. *See, e.g.*, *Grimes v. City and Cnty. of San Francisco*, 951 F.2d 236, 240 (9th Cir. 1991). However, if a party files written objections to the report and recommendation, the district court must "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* LR IB 3-2(b).

**III.   Discussion**

Having reviewed the record and report, this court holds that the factual findings are not clearly erroneous and these legal holdings are not contrary to law. Accordingly, save for a *de novo* review of defendant's specific objections, this court will adopt in full Magistrate Judge Albregts' report and recommendation and deny defendant's motion to suppress statements. (ECF No. 70).

To that end, defendant objects to two of the report's factual findings and both legal conclusions. Defendant contends that Magistrate Judge Albregts (1) erroneously concluded that defendant waived his *Miranda* rights and (2) incorrectly determined that defendant's post-*Miranda* statements were voluntary. (ECF No. 189 at 3, 9). The court will address each of these objections in turn.

. . .

. . .

. . .

**James C. Mahan**
**U.S. District Judge**

A. <u>Whether defendant's *Miranda* waiver was valid</u>

The court first addresses whether defendant's waiver of his *Miranda* rights was valid. Defendant posits that the report "erroneously rests on two unreliable proxies for comprehension and conflates the parties' burdens." (*Id.* at 3).

For a statement made during a custodial interrogation to be admissible, the prosecution must determine that the statements were obtained in compliance with the defendant's *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 449 (1966). A waiver of a defendant's *Miranda* rights must be "voluntary, knowing, and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998). A valid waiver of *Miranda* rights depends upon the "totality of the circumstances including the background, experience, and conduct of the defendant." *Id*.

There is a presumption against waiver. *Id*. Given that the government's burden to show waiver is great, the court will indulge every reasonable presumption against a waiver of fundamental constitutional rights. *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984), However, the government's burden is not more than a burden to show waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

    *i. Unprompted references to Miranda and prior criminal history*

The report reasons that defendant's *Miranda* waiver was valid because (1) he was the first to bring up the topic of *Miranda* and (2) it was not his first encounter with the criminal justice system. (ECF No. 168 at 7-8). Defendant argues that neither of these factors is a persuasive proxy for a waiver's validity. (ECF No. 189 at 3).

Defendant avers that the report focuses too heavily on the "voluntary" element of waiver, while ignoring the "knowing" and "intelligent" elements. (*Id.* at 4). Specifically, defendant's main argument is that his saying "*Miranda*" first, and before law enforcement had the opportunity

to do so, has no legal significance because there is nothing in the record that identifies the basis of his familiarity with *Miranda*. (*Id.*). He argues that his familiarity with *Miranda* stemmed from his exposure to popular media, not his prior criminal history. (*Id.*). Defendant concludes that the magistrate judge incorrectly shifted the burden to the accused to demonstrate the validity of a *Miranda* waiver. (*Id.* at 5).

The court concurs with the government in finding that the magistrate judge understood the legal framework regarding a valid waiver of *Miranda* rights and did not shift the burden to defendant. Defendant overlooks the "totality of the circumstances" standard and conflates it with the magistrate judge shifting the burden of proof, which he did not. *See Garibay*, 143 F.3d at 536.

There were multiple instances where defendant demonstrated that he knowingly, voluntarily, and intelligently waived his *Miranda* rights. Defendant was indeed the one who raised the subject of *Miranda* to the detectives, asking them, "[i]s that the *Miranda*?" (ECF No. 70-1 at 63). Symsek testified that before the detectives arrived, defendant also raised the subject of *Miranda* warnings unprompted. (ECF No. 120 at 113).

The magistrate judge also reasoned in his report that because defendant had *just* completed probation for federal charges, he was likely familiar with the topic of *Miranda*. (ECF No. 168 at 7-8) (emphasis added). Defendant's multiple, unsolicited references to *Miranda* coupled with his criminal history show that his waiver of his *Miranda* rights was knowing, voluntary, and intelligent, based on the totality of the circumstances.

### ii.  *Defendant's neurological disorders*

Defendant makes one additional objection regarding the validity of his *Miranda* waiver, and it concerns his mental disorders. He argues that the report fails to weigh appropriately his purported neurological infirmities. (ECF No. 189 at 7).

James C. Mahan
U.S. District Judge

- 7 -

Defendant allegedly has autism and suffers from Tourette's syndrome and ADHD. (*Id.*). As the magistrate judge wrote in his report, defendant himself noted that his disorders did not impact his ability to understand what was happening in the interview room. (ECF No. 168 at 8). He told Wright, "I don't want you to think that means I don't understand what's going on." (ECF No. 70-1 at 64-65). The antecedent of "that" is the three mental disorders listed, *supra*. (*See id.*).

Furthermore, Wright instructed defendant to tell him if defendant ever needed an explanation as to what was occurring. (*Id.*). Defendant also informed Wright he had taken his medication that day. (*Id.*). There is no evidence that defendant's alleged neurological disorders affected his ability to waive his *Miranda* rights.

The court adopts the magistrate judge's finding that defendant's waiver of his *Miranda* rights was valid.

B.  <u>Whether defendant's post-*Miranda* statements were voluntary</u>

Defendant objects to the magistrate judge's finding that his post-*Miranda* statements were voluntary, arguing that the report misconstrues the legal standing for rendering a confession involuntary and fails to address potential coercion. (ECF No. 189 at 9).

In evaluating the voluntariness of a confession, the test is whether "the government obtained the statement by physical or psychological coercion or by improper inducement." *United States v. Male Juv.*, 280 F.3d 1008, 1022 (9th Cir. 2002). The defendant's will must be "overborne" by the surrounding circumstances for a court to find that there was coercion. *United States v. Preston*, 751 F.3d 1008, 1016 (9th Cir. 2014).

Coercive police activity is a necessary predicate to a finding that a confession is not voluntary. *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011). "Coercive police activity can be the result of either physical intimidation or psychological pressure." *Id*. In the absence of

coercion, mental and emotional instability do not render inadmissible an intelligent and alert individual's voluntary statements. *Preston*, 751 F.3d at 1019.

Defendant takes issue with the report's (1) finding that coercion must be "outrageous" to render a confession involuntary and (2) failure to address the coercive nature of exchanging a promise to help defendant avoid the death penalty if he confessed to the alleged conduct.

As the magistrate judge found and the government's reply avers, there is no indication that any aspect of the detectives' interview promoted an involuntary confession. No coercion occurred, let alone any coercion that would be "outrageous." Before defendant made his confession, he asked one of the detectives, "[i]f I come clean about everything, is there any way that I won't get the death penalty?" (ECF No. 120 at 208). The detective simply responded, "[w]e will help you out every way we can." (*Id.*). As there was never a promise of leniency, there was no coercion that occurred when the detectives questioned defendant.

Finally, the government's reply makes key distinctions between the instant matter and the facts in *Preston*, a case upon which defendant relies. In *Preston*, there was a direct promise of leniency to the defendant, a disabled 18-year-old suspect who was informed by officers that if he confessed, his confessions would not be used against him. 751 F.3d at 1025. Here, it was defendant who raised the possibility of the death penalty, not the two detectives. Accordingly, the court adopts the magistrate judge's finding that defendant's confession was voluntary.

C. Pre-*Miranda* statements

Although the defendant indicates in a footnote that he "continues to assert that his pre-*Miranda* statements should be suppressed for all purposes as involuntary," he makes no specific objections to the magistrate judge's findings of fact or conclusion of law on this issue. (ECF No. 189 at 9 n.13).

**James C. Mahan**
**U.S. District Judge**

The government states it will not seek to admit any portion of defendant's conversation with Symsek during its case-in-chief, but it will seek to introduce these statements for impeachment purposes if he testifies. (ECF No. 192 at 4). Accordingly, the motion to suppress these statements is moot. However, the court adopts the magistrate judge's finding that these statements should not be suppressed, as Symsek never employed physical coercion or improper inducement when conversing with defendant. *See Male Juv.*, 280 F.3d at 1022.

## IV. Conclusion

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that Magistrate Judge Albregts' report and recommendation (ECF No. 168) be, and the same hereby is, ADOPTED in full.

IT IS FURTHER ORDERED that defendant John Matthew Chapman's motion to suppress statements (ECF No. 70) be, and the same hereby is, DENIED.

DATED April 10, 2024.

                                                    _____
                                                    UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**